**Floyd Junior SALLING, Plaintiff,**

**v.**

**Otis R. BOWEN, Secretary Department of Health and Human Services, Defendant.**

**Civ. A. No. 82–0428–B.**

United States District Court, W.D. Virginia, Big Stone Gap Division.

July 16, 1986.

As Amended Aug. 5, 1986.

---

Martin Wegbreit, Castlewood, Va., Larry Grant Browning, Lebanon, Va., Joseph E. Wolfe, Norton, Va., Birg E. Sergent, Pennington Gap, Va., Barry Proctor, Abingdon, Va., for plaintiff.

Morgan E. Scott, Asst. U.S. Atty., Roanoke, Va., Randolph W. Gaines, Atty. Gen., Julie Simpson, Washington, D.C., John M. Sacchetti, Baltimore, Md., for defendant.

## MEMORANDUM OPINION

GLEN M. WILLIAMS, District Judge.

This complaint was filed on November 12, 1982 by seven applicants for Social Security benefits, seeking injunctive and declaratory relief and challenging a proposed experiment whereby a government advocate appeared at their Social Security and Supplemental Security Income (SSI) disability hearings. The challenged program began operations October 12, 1982 and was considered a demonstration project under

the supervision of the Office of Hearings and Appeals (OHA) called SSA Representation Project (SSARP). The court notes initially that it is contended by the plaintiffs in this case that this is an experimental program of the Social Security Administration (SSA); whereas, the Department of Health and Human Services (HHS) in the various memoranda regarding this matter refer to it as "Adjudicatory Improvement Project" (AIP), indicating that there is a difference between an experiment and a project. Initially this program was to be conducted in the SSA's Offices of Hearings and Appeals (OHA) in Kingsport, Tennessee; Baltimore, Maryland; Columbia, South Carolina; Brentwood, Missouri; and Pasadena, California. However, for reasons which are not necessary to go into at this time, the Brentwood, Missouri Program has been discontinued. The Kingsport, Tennessee OHA serves the Southwest Virginia area and appeals from many of the decisions from the Kingsport office are therefore filed in this court. Thus, in the early stages of this program, this court was invited to attend a seminar-type hearing at which the program was explained for the edification of lawyers, the public and the court. This court was not able to attend in person but United States Magistrate Roy V. Wolfe, Jr. did attend this hearing as a representative of the court and informed the court of the general nature of the proceedings. As the exhibits in this case reveal, this program was to last for one year.[1a] Since this suit was instituted on November 12, 1982, exactly one month after the program came into being, and since the original suit papers moved for a preliminary injunction, an immediate hearing was scheduled by the court. On March 16, 1983, twenty-one additional plaintiffs filed a complaint concerning this same matter, requesting leave to intervene in this case and alleging that they were parties who had hearings either scheduled or completed before the Kingsport, Tennessee OHA and had been adversely affected by the program. These plaintiffs were permitted to intervene by an Order dated March 28, 1983 and Margaret Heckler, the new Secretary of HHS, was named as the party defendant.

On March 28, 1983, the court conducted a hearing on the motion for preliminary injunction, heard argument of counsel and evidence was presented in support of the respective positions of the parties. The court expressed the opinion at that time that since the program was for one year only and that the evidence needed to be further developed, the parties should proceed with discovery and an ample opportunity should be given to see how the program was working before the court arrived at any decision. Defendant filed a motion to dismiss and the plaintiffs renewed their motion for permanent injunction and for summary judgment. On October 4, 1983, approaching the end of the year's experimental program the court entered an Order denying defendant's motion to dismiss and overruling the plaintiffs' motion for summary judgment and directing the defendant to file with the court certain statistical data from the Kingsport, Tennessee OHA and other reports pertaining to the effect of the program and the case was continued.

In the meantime, the plaintiffs instituted a discovery process which is now a part of the record. Also many documents have been submitted on behalf of the defendant.

1a. The Secretary, by Federal Register (F.R.) publication on April 9, 1984, continued the SSARP "for a period of at least one year". 49 F.R. 13872. The court notes that the one year program had been in effect for almost exactly one and one-half years when the continuation notice was advertised, and that the Secretary elected not to advertise when promulgating and implementing the changes in converting the SSARP to the AIP. *See* the court's finding of fact #8 at page 52, *infra*. The Secretary in accordance with the requirements of the Administrative Procedures Act (APA), albeit nearly six months after the one year period initially advertised had elapsed, properly advertised the "period of at least one year" extension. However, on April 1, 1986, (nearly two years after the one year continuance advertisement) the Secretary elected to extend the project for an additional year, and to make substantial procedural and substantive changes in the conversion of the SSARP to the AIP, without F.R. publication as required by the APA.

This court has continued to monitor this program through cases which have come before this court, through various documents which have come into the hands of this court from various sources, and in particular, from documents which have been obtained from the Kingsport, Tennessee OHA.

Among the early documents filed by the defendant in this case is a report dated September 28, 1983 filed by Joy Loving. Ms. Loving is identified as the Acting Director of the SSARP. Joy Loving is described further as a person who reports to ALJ Edward Steinman, Director of the Office of Field Administration, OHA. The Chief ALJ of OHA is Phillip P. Brown. The report of Joy Loving dated September 28, 1983 is directed to Louis B. Hayes, Associate Commissioner, OHA, and the subject of the report is "Status of SSA Representation Project—Decision." In this document, Loving summarizes as follows:

> I do not believe we yet have sufficient data to accurately assess the effects of the project. Of special significance is that a number of events and circumstances have occurred during the project's initial implementation period which have significantly affected HO performance. These include: the increases in receipts of requests for hearings and in the proportion of project and non-project cases in which the issue is continuing disability; installation of the Wang equipment; staffing problems in part the result of the hiring of decision writers from the participating HO's as SSAR's and the publication of numerous Social Security rulings, to establish a single set of adjudicatory standards for SSA decision makers ... rulings which the SSAR's have been using extensively in stating the SSA's position in SSARP hearings.

The report goes on to state that the data is so inconclusive that it cannot show any effect of the SSARP one way or the other. The report takes note of the fact that this particular lawsuit challenging the project is pending and discusses various options as to what should happen at the end of the one-year period of the project. The report considers the pros and cons of three options: (1) discontinuing the SSARP; (2) continuing the SSARP for one year; and (3) continuing the SSARP and expand it to additional offices. In discussing the cons of these various options, Loving states as follows: "Since there have been significant difficulties with three of the five current SSARP OHAs, continuation alone might not yield wholly useful data." Loving goes on to note that if options (1) or (2) are selected, they could get by without any Federal Register notice; but option (3) would require a Federal Register notice. In keeping with a well-known dogma in the current world of bureaucratic operations, that a bureaucracy feeds upon itself, it is not surprising that Loving recommended option (3) That is, that the program be continued beyond its original year and that it be expanded to additional offices.

On December 18, 1984, this court permitted nine more plaintiffs to intervene in this suit. In the meantime, various parties who had been permitted to intervene as plaintiffs had arrived at a position where their cases were pending before this court and were being delayed pending the outcome of this case. Therefore, this court opted to allow various plaintiffs to have their cases heard individually on the merits and permitted them to withdraw from this action. Many of the plaintiffs took advantage of this procedure. At that point in time, the court was still under the impression that this was a one-year program and that once the plaintiffs' cases had been disposed of on their merits, and particularly assuming a favorable decision had been arrived at, the case would become moot. However, as we shall see, the program has fed upon itself and is now embarked upon a period of expansion. Therefore, the time has come when it is necessary for the court to consider this case on its merits.

Before going into the operation of SSARP, it is necessary to review the administrative procedures involving Social Security and the role of SSARP in the overall administrative procedure as it exists today.

## JURISDICTION

The original plaintiffs and all intervening plaintiffs contend that this court has jurisdiction under § 205(g) of the Act, 42 U.S.C. § 405(g). The defendant Secretary of HHS conversely contends that this court lacks jurisdiction because none of the original plaintiffs nor intervening plaintiffs exhausted their administrative remedies before filing this action or intervening therein. This contention was also advanced in *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) (Brennan, J. dissenting), the controlling Supreme Court decision in procedural due process cases involving exhaustion of administrative remedies as a jurisdictional prerequisite to district court appellate review. While it is all but axiomatic that in the usual case of appellate review of decisions of administrative agencies that exhaustion of administrative remedies is an essential prerequisite to appellate review, the *Eldridge* majority carved out an exhaustion exception in the following calculus:

> Implicit ... is the principle that this condition [exhaustion of administrative remedies] consists of two elements, only one of which is purely 'jurisdictional' in the sense that it cannot be 'waived' by the Secretary in a particular case. *The waivable element is the requirement that the administrative remedies prescribed by the Secretary be exhausted. The nonwaivable element is the requirement that a claim for benefits shall have been presented to the Secretary.* Absent such a claim there can be no 'decision' of any type. And some decision by the Secretary is clearly required by the statute.

*Id.* at 328, 96 S.Ct. at 899 (emphasis added).

The *Eldridge* Court further concluded:

> That this second requirement is an essential and distinct precondition for § 405(g) jurisdiction ... Eldridge [as have the original plaintiffs and intervening plaintiffs] has fulfilled this crucial prerequisite.

*Id.* at 329, 96 S.Ct. at 900.

Continuing, the *Eldridge* majority said:

> Eldridge [as do the plaintiffs herein] concedes that he did not exhaust the full set of internal-review procedures provided by the Secretary.... [But the Court] ... recognized, the Secretary may waive the exhaustion requirement if he satisfies himself, at any stage of the administrative process, that no further review is warranted either because the internal needs of the agency are fulfilled or because the relief that is sought is beyond his power to confer.... the power to determine when finality has occurred ordinarily rests with the Secretary since ultimate responsibility for the integrity of the administrative program is his. *But cases may arise where a claimant's interest in having a particular issue resolved promptly is so great that deference to the agency's judgment is inappropriate.*

*Id.* at 330, 96 S.Ct. at 900 (emphasis added).

As the Court observed in *Eldridge*, "This is such a case," we hold that this also is a case in which deference to the agency's judgment is inappropriate.

■ As in *Eldridge*, the constitutional challenge of the original plaintiffs and the intervening plaintiffs is entirely collateral to his (their) substantive claim(s) of entitlement. Without exception each of the plaintiffs has raised a colorable constitutional claim that because of their physical condition or dependency upon disability benefits, an erroneous determination brought about or contributed to by the SSARP would deprive him of due process, and would damage him in a way not recompensable through retroactive payments. *See, Id.* at 331, 96 S.Ct. at 900. The court, therefore, holds that it does have 405(g) jurisdiction in this case. *Cf. Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970) (where the Court held that a pretermination evidentiary hearing is necessary to provide a welfare recipient with procedural due process; the *Eldridge* Court differentiated *Goldberg* primarily on the basis of the dire economic circumstances of a welfare recipient as contrasted to those of a social security disability insurance benefits recipi-

ent);[1] and *Weinberger v. Salfi*, 422 U.S. 749, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975) (where the Court held that 42 U.S.C. § 405(h) requires exhaustion of administrative remedies before seeking district court appellate review in a social security § 405(g) appeal but found that the Secretary had waived the exhaustion requirement. The *Eldridge* Court distinguished claimant Salfi's situation from that of claimant Eldridge and construed *Salfi* in the process).

## AN OVERVIEW OF THE ADMINISTRATIVE PROCESSES AND COURT PROCEEDINGS AVAILABLE TO PLAINTIFFS SEEKING SOCIAL SECURITY BENEFITS

Because almost every wage earner and self-employed person in the United States are required by law to pay into the Social Security system, these citizens have every right to expect that, when the time comes for them to be recipients of the Social Security fund, they will be treated fairly by those administering the program. Therefore, the administrative processes in the SSA should be the fairest in any of the various administrative procedures of government. It should be simple, efficient, streamlined and speedy within due process limitations. In actuality, the administrative procedures for obtaining Social Security are the most cumbersome, unfair, contradictory, inefficient to be found in all the various government agencies in all the bureaucracy. Every person who applies for disability Social Security benefits should be considered to be an honest citizen until shown to the contrary. Instead, the process appears to infer that the applicant is viewed with suspicion and the burden is on him or her to prove to the contrary. The administrative processes which are conducted in Social Security cases should be designed to seek out the truth; instead, the hearing processes from the time a person applies for disability Social Security benefits through the Appeals Council procedures are geared to deny claims rather than pursue truth wherever it leads. If it is true in the criminal process that it is better for several guilty people to go free than that one innocent be put behind bars, it seems better for a few people to obtain disability Social Security benefits who may not be entitled to them or who may be borderline cases than that deserving disabled people be stripped of benefits or denied benefits because of cumbersome bureaucratic proceedings. This court has no doubt that in every city and hamlet that there are people on the street who are drawing disability Social Security benefits and are as able to work as anyone. On the other hand, it is just as easy to look to the other side of the street and see an individual near death, from common observation, completely unable to perform any kind of

1. The circumstances in the claim of intervening plaintiff, Marceleen F. Scott, who was permitted to intervene by order of the court entered August 19, 1985 is very analogous to that of welfare recipient Kelly in *Goldberg v. Kelly, supra*, in that Scott was an SSI claimant under Title XVI of the Act (SSI replaced and superseded long standing welfare programs of aid to the aged and to the permanently and totally disabled). Scott appeared and testified before this court on August 19, 1985, and it was readily apparent by her appearance and from her sworn testimony that she was acutely ill, physically and emotionally, and in dire and necessitous circumstances. She was awarded both SSI and widow's disability insurance benefits by an ALJ. But the SSAR who represented the Secretary in her hearing (who appeared only because she was represented by counsel) wrote a brief to the Appeals Council setting forth his opinion and reasons as to why the Council should take an own motion review of the ALJ's decision in Scott's case. The actions of the SSAR and the Appeals Council in this case put into clear focus the damaging effect and potentially damaging effect inherent not only to Scott but to every claimant whose claim is subject to the SSARP as implemented in the Kingsport, Tennessee OHA. Scott was eventually awarded her benefits but only after great and unnecessary delay. Her case is a procedural travesty resulting from the implementation of the SSARP wherein the SSAR violated the Secretary's regulations because of his filing a brief with the Appeals Council. The court feels that the treatment to which she was subjected by the SSAR under the SSARP was a clear violation of the Secretary's regulations and of Scott's due process rights. Even though she was eventually awarded the benefits to which she was so clearly entitled, she suffered damage for which there is now no recompense. *See* p. 1065, *infra*.

function and yet, his or her claim has been pending four or five years or more, or been completely and finally denied. Of course, perfect justice is elusive, but something is wrong in this society where this particular process is so lengthy, the procedures so cumbersome, and the rules and regulations so subject to change.

There are four essential steps in the Social Security claims procedure before a case is brought to this court: (1) the initial stage; (2) reconsideration; (3) hearing; and (4) Appeals Council review. Since the procedure is practically identical, the court will discuss the initial stage and reconsideration under the same heading.

## A. INITIAL STAGE AND RECONSIDERATION

When a person files a Social Security claim involving disability, it is first filed in the SSA District Office and is then forwarded from the District Office to the state Disability Determination Service (DDS). The DDS of each individual state therefore makes the initial determination of whether or not a person is disabled. In 1981, the average denial at the first stage of state review was 60%.[2] The percentage of allowances on initial claims varied from 41.5% in Rhode Island to 19.3% in Puerto Rico.[3] Neither at the initial stage nor at the reconsideration stage is the individual ever seen by any of the persons who make the decision in the DDS. When a person is denied benefits at the initial stage, he has a right to ask for reconsideration within sixty days. This simply means that the DDS reexamines the file by placing it in the hands of a new adjudicator who is not familiar with the case. Usually, no additional evidence is acquired at this point and the decision is made solely upon the application and medical records in the file. Under the most recent statistics, the reconsid-

eration affirms 87% of the initial denials.[4] The SSA's ALJs use the Act, as amended, and the Federal Regulations promulgated by the SSA to determine disability and these same standards are also used by the Appeals Council and by United States District Courts and Courts of Appeals. In contrast, the states do not use either the statute or the regulations. They use a manual provided by SSA named Social Security Program Operation Manual System (POMS). The POMS completely ignores federal court decisions interpreting the Act and in many instances are in direct conflict with the Social Security statutes and regulations.[5] Some of the examples of the differences between the POMS and other regulations are: (1) The POMS does not have any guidelines for pain so that pain is simply ignored by state disability analysts, even though the decisions by the courts are in complete unanimity that pain within itself may be a disabling condition. (2) The SSA regulations have a specific definition of a non-severe impairment, while the POMS lists twenty examples of conditions which are considered non-severe; therefore, the examples which are used by the states are arbitrary standards which do not have any standing in law and prevent each case from being decided on its own merits. These rules have been adopted without any opportunity for public comment and do not have any standing in law whatsoever. (3) The Social Security regulations and the POMS also have a different perspective concerning the determination of residual functional capacity. The POMS use their own medical criteria in deciding what a person can do despite his limitations and these cover only three impairment areas of an individual, musculoskeletal, cardiovascular and pulmonary. The POMS is therefore arbitrary in nature and gives no consideration to the possibility that two people may have different limitations based upon the same impairment. Furthermore, the

---

2. U.S. Congress, Hearings on H.R. 5700, 97th Cong., 2d Sess., 1982, p. 14.

3. "Umemployment insurance reports with Social Security" No. 1105, September 2, 1982, Commerce Clearing House, Inc.

4. U.S. Congress, Hearings on H.R. 5700, March 16, 17, 1982, p. 13.

5. Cofer, *Judges, Bureaucrats and the Question of Independence—A Study of the Social Security Administration's Hearing Process,* p. 125.

state agencies do not even have the same classifications for work and do not give any consideration to the classification of sedentary work. (4) The POMS does not recognize alcoholism and drug addiction as being disabling in and of themselves, despite the fact that Social Security regulations recognize and define alcoholism and drug addiction. In other words, before one who has an alcoholic or drug condition can be found disabled by a state agency, he must have another impairment which constitutes a disability. (5) The POMS has a different standard for determining a rehabilitation exemption by allowing only persons who are not expected to improve to continue to receive benefits until their rehabilitation process has been completed. Furthermore, the POMS has a time in which recovery is expected in a rehabilitation program and one does not receive disability under the POMS once this period of time has been reached regardless of the condition of the person. (6) The POMS provide an entirely different standard with regard to consultative medical examinations. The state agency gives far more weight to its own consultative examinations than it does to the evidence which is in the claimant's file. Court decisions require that great weight be given to the existing medical evidence and in particular, the reports of treating physicians. The state agency regards its own consultative examinations as conclusive and is inclined to completely ignore the data which is presented by the claimant. Even if there is sufficient medical evidence already in the file to make a determination of the person's disability, the POMS requires a mandatory consultative examination before Social Security benefits are granted; therefore at this early stage, conflicting medical reports enter the claimant's file, which hamper or prevent obtaining medical benefits.[6]

## B. THE HEARING BEFORE AN ADMINISTRATIVE LAW JUDGE

The first face-to-face meeting that an applicant for Social Security disability benefits has after application is with an ALJ. There are approximately eight hundred ALJs within the SSA which makes the SSA–ALJ corps more numerous than Article III judges. The total number of ALJs for all agencies of government is authorized at approximately thirteen hundred and generally, the Social SSA's corps makes up about 60% of all ALJs.[7] When the claimant appears before an ALJ, he or she will appear before a person not wearing a judicial robe, who is required by law to act with three hats, (1) a judge, (2) a representative of the government who cross examines the claimant, and, (3) an adviser to the claimant, required by regulation to fully develop the case to see that the claimant has a fair hearing regardless of whether the claimant is represented by counsel or otherwise. The proceeding is informal and a hearing assistant will be present to make a tape of the hearing. The ALJ always begins a hearing by explaining his or her impartiality and the fact that he or she is not paid by the SSA but by the Office of Personnel Management. The hearing by the administrative law judge is a *de novo* hearing, meaning that all previous decisions are not binding. Thus, ALJs' decisions are not reversals because the ALJ looks at the matter from a fresh perspective and, for the first time, hears oral testimony and looks at a live person, rather than reviewing a stale record. The testimony is taken under oath. However, the ALJ has no contempt power nor very little other powers that ordinary judges possess. The burden of exploring all pertinent facts and issues rests with the ALJ and in many cases, the person is not represented by counsel nor by any other person. Under mandates of the SSA, not only is the hearing before the administrative law judge informal but it is non-adversarial in nature and the ALJ must develop the case record on behalf of the SSA and the claimant; informal rules of evidence

---

6. *Ibid.*, pp. 125–29.

7. Lubbers, *Federal Administrative Law Judges: A Focus on Our Invisible Judiciary,* Administrative Law Review 33 (Winter 1981), pp. 130, 131.

apply and are much more lenient than in court proceedings. Thus, in seeking justice, an ALJ may accept into evidence an old scrap of paper by a long-deceased physician as long as it is germane to the claimant's case. This is the only proceeding in which a claimant is heard and seen by anyone who even claims to be disinterested in his case until such time as his case may be taken to court. Sixty percent of the persons who were denied disability benefits at the reconsideration stage appealed their decisions to an ALJ [8] and by 1980, the reversal rate had reached 60% overall and 65% in cases involving cessation of benefits for individuals once declared disabled by SSA.

While an ALJ tells a claimant who appears before him that he is an independent person, charged with making an independent decision, and despite the fact that the history of the appointment of ALJs and court decisions support the view that an ALJ is an entirely independent entity, the efforts to control the independence of judges in the last ten years by upper echelon bureaucrats is astounding. The job description of an ALJ and the fact that he or she is divorced from the SSA itself by being placed over in another agency and paid by another agency would tend to establish the independence of the ALJ. Furthermore, the Administrative Procedures Act (APA) guarantees the independence of ALJs. The United States Supreme Court has made it clear that a hearing examiner's findings and conclusions should be given weight independent of higher agency evaluation. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). Nevertheless, in recent days, the United States Court of Appeals for the Fourth Circuit has held that *Universal Camera* does not apply to Social Security ALJs. Thus, this court reviews the decision of the higher agency, in this case, the Appeals Council, rather than the ALJ. *Kellough v. Heckler*, 785 F.2d 1147 (4th Cir.1986); *Gross v. Heckler*, 785 F.2d 1163 (4th Cir.1986). Furthermore, in 1978, the United States Supreme Court supported the independence of all ALJs throughout the bureaucracy by ruling that ALJs within federal agencies are entitled to absolute immunity from damage liability. *Butz v. Economu*, 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978). In 1980, in *Nash v. Califano*, 613 F.2d 10 (2nd Cir., 1980), it was held that an ALJ with the SSA OHA had standing to sue upon the alleged invasion of his statutory right of decisional independence and the case was reversed and remanded to the United States District Court for the Western District of New York for trial on the merits. Despite these decisions, because of high ALJ reversal rates, both Congress and the Executive Branch of government have carried on a campaign to control the independence of ALJs, in theory, to hold down the number of people who are placed on disability Social Security. To understand the thrust of the SSARP it is helpful to review the prior and continuing restraints on ALJs.

## THE QUOTA SYSTEM

In 1975, the Bureau of Hearings and Appeals, now the OHA, commenced procedures designed to increase the productivity of ALJs. This was accomplished by offering incentives to those ALJs who had high production by increasing their support staff, by treating them more favorably in transfers and by providing them trips to the National Judicial College at Las Vegas. On the other hand, productivity was pushed through threats of firing. In 1978, one of the issues in a law suit filed by five ALJs against the SSA concerned threats of firing for low productivity. *Bono et al v. Social Security Administration et al*, No. 77–0819–CVW–4 (W.D.Mo.1979). This case was eventually settled, one of the terms being that OHA would not issue directives or memoranda setting any specific number of dispositions by ALJs as quotas or goals. During hearings before a subcommittee on Social Security in 1979 before the House Committee on Ways and Means, the subcommittee staff concluded:

---

**8.** Hearings of the 97th Cong., 2d Session, 1982.

The greater emphasis in all phases of the process has been placed on 'moving the cases' rather than rendering fair and sound decisions. Up to now, in BHA's continuing struggle to achieve a balance between quantity and quality, the definite winner has been quantity.[9]

The *Bono* settlement and hearings by Congress however did not end the quota system. In 1982, the Director of Field Administration directed regional chief administrative law judges to take appropriate adverse action against under—achieving administrative law judges. At least one result of this was that four administrative law judges had low productivity charges leveled against them. One of these retired before going to a full hearing, while the other three eventually received exonerating decisions from the hearing board.[10]

In 1981, Louis Hayes, Associate Commissioner, told Congress that he had set a goal of forty-five dispositions per month for the administrative law judges. In 1982, in testifying before the Senate Subcommittee on Oversight of Government Management, administrative law judge Francis J. O'Byrne, Sr. testified as follows:

> Meeting the heavy and ever-increasing caseload has not been without cost. My decisional quality is not as good as it once was. I do not have time to polish decisions. Instead of striving for good to very good decisions, I have to settle for good enough. ... I cannot maintain this level of monthly decisions for any extended period of time. In order to close 166 cases through April 1982, I have come to the office early, have worked on Saturday, traveled to out of state hearing sites on my own time and worked a 70–hour week on a hearing trip to Wisconsin. Judges all over the country have been making this extra effort because we wish to accommodate claimants waiting for a hearing. The judges

do not get paid for overtime or receive compensatory time.

> This ALJ was disposing of cases at the rate of 41 per month.

It matters not whether one calls this "quotas" or "goals." The net result is that according to Congressional findings and according to ALJs and certainly from the viewpoint of this court, the increase of productivity has resulted in harm to the claimants. When one places a goal of numbers rather than the pursuit of truth and justice, then the emphasis is misplaced, particularly in Social Security hearings. The sole emphasis should be on a fair hearing. It is the observation of this court from reviewing opinions of 25 to 30 different ALJs per year, that their biggest single failure has been in properly developing the case from the claimant's standpoint. This duty is specifically charged to the ALJ and when he is threatened with production goals, he has an inclination to accept the cases as he finds them without obtaining additional reports.

## QUALITY CONTROL

Beginning in 1975, or early 1976, a quality assurance program was instituted in three parts: (1) quality review system; (2) appellate appraisal system; and (3) regional chiefs peer review system. All three of these programs were aimed at picking out those ALJs with a high reversal rate of state DDS denials. This program exists in one form or another right on down to the present day. It is basically a system whereby the higher authorities in the OHA continue to monitor the opinions of those judges who render decisions favorable to the claimants. This program operates under the presumption that if an ALJ is rendering too many decisions in favor of the claimants, he is more inclined to be wrong than those who are denying claims.

9. Subcommittee on Social Security, U.S. House of Representatives, Social Security Administrative Law Judges: Survey in Issue Paper, January 27, 1979, p. 6.

10. *SSA v. Irving Shore*, MSPB No. HQ75218210013; *SSA v. Robert W. Goodman*, MSPB No. HQ752218210015; *SSA v. Jerry G. Brennan*, MSPB No. HQ75218210010; *SSA v. Stanley M. Ballaban*, MSPB No. HQ75218210014.

Among other things that were done to the judges was to send them to school where they were given additional instruction in regulations. As part of the settlement in the *Bono* case, OHA promised to prepare a memorandum to the ALJs describing the operation of the quality assurance program, including the quality review system and to issue a memorandum clarifying the status of the regional peer review and the hearing office manager program. Pursuant to the *Bono* settlement, the Acting Associate Commissioner for Hearings and Appeals issued a memorandum to the ALJs emphasizing that the quality review system was not designed to assess individual ALJs or the particular decisions rendered. If, however, there was ever intention to cease the review of those ALJs who had a high reversal rate, it was short-lived. In the disability amendments of 1980, the Bellmon amendment (Section 304(g)) called for a pre-effectuation sample review of ALJ allowances over state denials. These were implemented and without going into details as to the review, the ALJs with a high allowance rate were reviewed and if an ALJ had a proven decisional accuracy as determined by the Bellmon review, then he would be taken out of the review system. The Bellmon review was designed to provide data on the overall percentage of "defective cases" meaning those which had some sort of deficiency as determined by higher authorities. If the ALJs did not meet the standards which were set out by the Bellmon review, they would be called in for counselling, or given additional training and were threatened that if improvement did not occur, that is, if the number of reversals did not decline, other steps would be considered. Beginning in October, 1981, 65 ALJs who had the highest individual allowance rates received an own-motion recommendation by the Appeals Council. The ALJs involved received a memorandum from the Chief ALJ informing them that they had been selected for review and in essence, was telling the ALJs that their rate of reversal decisions was too high and that they would continue under review until this was corrected. If there ever was a

chilling of judicial independence, this is it. This is like threatening a lawyer with disbarment if he takes a case of a controversial nature. This is the same as saying that every law judge in the country should be deciding a certain percentage of cases against the claimant.

## THE GRID SYSTEM

This is a system whereby the Secretary has established tables known as the "grids" which outline major functional and vocational patterns in order to assess a claimant's ability to work relative to that of an able-bodied person. It is applied in a sequential evaluation whereby the ALJ begins by determining if the individual is engaged in substantial gainful activity and if he or she is, they are not disabled. Next, there is a determination of whether a person has a severe impairment. Then whether he or she has an impairment which meets or equals a listed impairment in App. 1, Subpt. P, Pt. 4, 20 C.F.R. *See* 20 C.F.R. §§ 404.1520 and 416.920. If it is found that a person does not meet a listing, the question comes, whether or not the individual can return to his or her past relevant work. As this court has pointed out, the grids focus upon a mechanical non-human type of determination to place everyone in the same type of disability mold. It does not take into account that a problem which might handicap one person might not handicap another. This was another device arrived at by the SSA to decrease the number of reversals which were occurring from the ALJs' reversals of state DDS findings. This court has discussed the grids in detail in *Phillips v. Harris*, 488 F.Supp. 1161 (W.D.Va.1980). The United States Supreme Court has upheld the grid regulations, however, it found that the grids cannot be applied where there are both exertional and non-exertional impairments present in a claimant, but that a vocational expert should be called to address the issue of transferability of skills if pertinent to the case. *Heckler v. Campbell*, 461 U.S. 458, 103 S.Ct. 1952, 76 L.Ed.2d 66 (1983). When the grids were implemented, the SSA

thought that there would be a decrease in reversals by ALJs. However, the statistics show that the effect has been just the opposite. The new regulations require findings of disability in many cases that would have previously been denied because the grids group individuals by age, education and work skills. This arbitrary grouping of classifications does not allow the ALJs to consider the claimant as an individual, that is, a separate human being. This arbitrary grouping by classification of the grids requiring the ALJ to find disability was in direct conflict with the state judgment made under the POMS. Therefore, in 1980, reconsideration denial under the state POMS had grown to 82.2%, whereas, the ALJ allowance rate was increasing because of the use of the grids. The primary result of the grids was to increase the number of people over age 50 being entitled to an automatic finding of disabled.

## DOCTRINE OF NON–ACQUIESCENCE

The Second Circuit stated in an opinion in 1980:

> The position of any administrative tribunal whose hearings, findings, conclusions and orders are subject to direct judicial review is much akin to that of the United States district court ... and as must a district court, an agency is bound to follow the law of the circuit.

*Ithaca College v. NLRB*, 623 F.2d 224, 228 (2d Cir.1980); *cert. denied* 449 U.S. 975, 101 S.Ct. 386, 66 L.Ed.2d 237 (1980). This, of course, is simply a restatement of the historic and fundamental doctrine of *Marbury v. Madison*, 1 Cranch. 137, 2 L.Ed. 60 (1803). The lower federal court rulings are laws which an agency must follow. In one of many decisions in which federal courts of the United States have expressed concerns by the failure of the Appeals Council to follow decisions of the courts (*stare decisis*), the courts have chastized the Appeals Council for its actions. In *Finnegan v. Mathews*, 641 F.2d 1340 (9th Cir.1981), it was held that an SSI recipient could not have his benefits terminated unless there

had been an improvement in the medical condition or the prior state determination had been clearly erroneous. The SSA reacted to this decision by non-acquiescence and openly stated that its own policy provided that the claimant could be taken from the disability rolls at any time that he was found not to meet the requirements, meaning that even if they had not changed, the SSA could change the ruling at any time. Likewise, in *Patti v. Schweiker*, 669 F.2d 582 (9th Cir.1982), a similar ruling was made by the Fifth Circuit and again, the SSA refused to acquiesce to the decision. In a memo dated May 23, 1984, the Deputy Commissioner of Programs and Policies, SSA, announced that the SSA was persisting in its policy of non-acquiescence to circuit and district court decisions. Recently, it has been publicly announced that the SSA is reviewing and is inclined to acquiesce, however, even to this date, ALJs are in an untenable role and do not know what position to take. This court has interviewed many ALJs from five or six different cities and all of them have expressed concern about orders which they receive to follow the policy of the administration rather than to acquiesce in court decisions, while other judges will openly state that they are attempting to follow court decisions and the rule of precedent in order to make an effort toward consistency in the application of law. All ALJs with whom this court has spoken on the subject agree that each separate individual seeking benefits through federal court must file a suit simply because the Secretary of HHS refuses to administer precedent throughout the United States. ALJs are also concerned by the selectivity of cases for appeal to the various circuit courts and to the United States Supreme Court in order to establish a definite precedent. Therefore, ALJs are torn between two masters and cannot comfortably follow court precedent which has been properly indexed and formally reported in cases. If ALJs would follow precedent, a reduction in their caseload would immediately occur. This court finds it necessary to remand many, many cases simply because ALJs do not follow

the precedent of the United States Court of Appeals for the Fourth Circuit. This makes it very difficult for this court. It appears that the purpose of the doctrine of non-acquiescence is to bar deserving claimants from receiving their Social Security benefits. This court recently had a case before it which was remanded in 1982 after having first come on the docket of this court in 1979. This case remained for four years in the administrative system below and the court was shocked at what had occurred while the case had been on remand. The court had remanded the case for reconsideration because of improper interpretation of the grids. Upon remand, the Appeals Council sent the case to an ALJ and when the ALJ made a favorable decision, the Appeals Council again reversed and sent it to another ALJ. Eventually, four separate ALJs found in favor of the claimant and the Appeals Council reversed all four of them and then, did not return the case to court until the court ordered it to do so; after which, the court for the fifth time reversed the Appeals Council. In summary, seven years after this claimant came to court, a final decision was made by this court and the claimant is now receiving benefits.

## THE CESSATION PROBLEM

In order to reduce the number of people on Social Security disability rolls, Congress required the Administration to begin a policy of reviewing all of the cases of the people drawing Social Security disability benefits or as many as possible with the idea in mind to cause cessation of benefits to people who had been receiving Social Security disability benefits. This policy created so much chaos by clogging the dockets of the ALJs and the dockets of the courts and so much public dissatisfaction that Congress eventually ended this program and directed these cases all be remanded for reconsideration. At the present time, these cases have not come back to this court and the court is not in a position to comment on what the future holds in this regard. But, it illustrates another effort to reduce the number of people who receive Social Security disability benefits.

## C. THE APPEALS COUNCIL

The last level of administrative review available to the claimant before taking his case to court is to request review of his case by the Appeals Council. The Appeals Council has a prerogative to initiate review proceedings on its own. Rarely, if ever, does one find the Appeals Council on its own motion, reviewing a case where the claimant has been denied benefits, however, it is fairly common, where an ALJ has granted benefits that the Appeals Council will take advantage of its prerogative of own motion review. The Appeals Council does not see the claimant but merely reviews the record. It can receive new evidence, however, it is the experience of this court, that if it does receive new evidence, it usually fails to comment on it or to give any reason why the new evidence is rejected or accepted. The Appeals Council denies 87% of the requests for review outright. As this court has heretofore noted, an Appeals Council decision which reverses an ALJ's favorable decision or adopts a recommended decision is considered the last decision of the Secretary and is therefore the decision which is subject to review by the courts. However, if the Appeals Council refuses to review or affirms an ALJ's decision, the decision of the ALJ is the Secretary's final decision subject to review by the courts. Also, as previously noted, this is the only type of administrative proceeding in which the ALJ actually hearing the case is not given the benefit of his findings of fact.

This court is of the opinion that money expended for the Appeals Council and its staff is unnecessary expense. Why should the ALJ not be the final arbiter in the case? If he does his duty, he is supposed to express the government's viewpoint, develop all the evidence that can be obtained for the claimant or the government, and to conduct a fair and just hearing. If an appeal is to be granted, it should after hearing be taken directly to court because

the ALJ is in the best position to judge the case having seen the claimant and being in an area where he is familiar with the doctors involved. In a time when efforts are being made to save money, the abolishment of the Appeals Council and one of the two stages of state DDS review is worthy of great consideration.

## SSA REPRESENTATION PROJECT (SSARP)

Court Exhibit 1 is 20 C.F.R. Parts 404 and 416 entitled "Project to Improve the Hearing Process through the Involvement of SSA Representatives." This was published in the Federal Register Volume 47, No. 181, on August 19, 1982. This is called a project the purpose of which is to determine whether SSA representatives in disability cases at the administrative hearing level can contribute toward improving the quality and timeliness of hearing dispositions. These representatives will be able to "sharpen factual issues" and "remove the burden of case record development from ALJs." The project is listed as having a duration of at least one year and is to be instituted in five offices.

As a background for these rules, it is stated that there has been a "lack of decisional consistency within SSA's several levels of disability adjudication and among SSA's ALJs." It is further mentioned that there has been an unprecedented increase in the number of hearing requests resulting in "backlogs and delays for claimants awaiting hearings." In other words, this should result in all of the ALJs having about the same percentage of reversals, and to speed up the hearing process. It is emphasized that this is a limited test. The program further provides that the SSAR will have the power to "ask that the administrative law judge disqualify himself or herself" and that the SSAR has the power to "recommend that the administrative law judge issue a favorable decision without the need for a hearing." The SSARs are to appear at the hearing if the other side is represented by counsel. The regulations further specifically state that: "After the

hearing, the SSA representative will not participate in any proceedings before the Appeals Council although the Appeals Council may exercise its own authority to review any case on its own motion." The regulations further provide that the SSARs will be employed directed by the OHA and they will be located in or near the OHAs. Thus, the SSARs are not independently employed but are under the direct control of the OHA. It is made clear that the SSARs' prehearing case activities are "outside the purview of the ALJ who will not be assigned to the case until the SSA representative has completed his or her preparation for the hearing." With regard to the relationship between the SSA representative and the Appeals Council, Section 6 provides that the SSARs shall be allowed "to bring cases to the attention of the Appeals Council for possible review on its own motion." On the other hand, "nor will the SSA representative submit arguments, comment on new evidence or otherwise participate as a party in Appeals Council proceedings." An evaluation of this program will be based on whether it has improved timeliness and quality of the disposition of cases. This sounds very much as though this is a continuation of the program of setting quotas and increasing the productivity of the ALJs, where quality means fewer reversals. The regulations discuss at length the question of whether the intention is to make this an adversary process. It is clearly stated that it is not the intention that the SSAR would categorically advocate affirmation of DDS decisions and therefore it would remain to be seen whether the SSAR was actually an adversary. Therefore, it would not be subject to the Equal Access for Justice Act for the purpose of providing fees because it would not be presumed that the SSAR will not be "substantially justified."

Beginning the first of April, 1986, the AIP, instead of terminating, embarked upon a new plan which is designated in the following manner: a memorandum from Frank V. Smith, III, Executive Manager of the AIP, dated March 5, 1986, filed as Court Exhibit 2. An AIP statement is filed

as Court Exhibit 3 and a memorandum from Peter H. Gilmore, Project Director, AIP, dated April 10, 1986, is filed as Court Exhibit 4. Court Exhibit 2 reflects that the new project got underway on April 1, 1986 and the restructuring was undertaken in accordance with the existing regulations at 20 C.F.R. 404.965 and 416.1465 which provide the project's purposes and indicate that the project purposes will remain the same and the substantive procedure set forth in these regulations are not being modified. The most significant change in the restructuring of the SSARP is the separation of SSARP offices from the participating OHAs offices, both physically and organizationally. This also results in a revision of the case processing procedures for SSARP cases, makes the SSARP offices entirely independent of the ALJs and OHAs, and greatly changes the manner in which a file is handled. This program expands the bureaucratic make-up of the project offices and since the offices are now divorced from the OHAs, this requires more administrative personnel and therefore more employees and upgrades the positions of some of these employees. Charts are provided to illustrate the make-up of these separate SSARP offices. Instead of going to the OHA in Kingsport, the claim file goes directly to the SSARP office and remains under its control until such time as the case is ready for hearing. Only then will the ALJ see the file and have anything to do with the case. The SSARP offices do all the prehearing screening, case docketing, control, selection of documents to be included in the hearing exhibit, preparation of the exhibit list, preparation and release of development requests, contact with the attorney if there is one, and contact with the claimant where there is no attorney and direct intervention on the part of an SSAR where the person is not represented, by communication with the claimant. Indeed, the ALJ who will eventually try the case will not know that he is assigned to the case until the case has been received in the OHA for hearing. The SSARP, now AIP, whose employees are employed and under the direct control of the OHA will have complete control of the file without the ALJ even seeing it until the time of the hearing. This again acts as a halter on the independence of the ALJs in the handling of cases, and places the file not in the hand of an independent person but in the hands of an advocate of the government. Once the ALJ receives the file, assuming that he should decide that additional evidence is needed for development of the case, the SSAR again will be given the opportunity to review the file, including additional development prior to the case being scheduled for hearing. No such provision is made for the representative of the claimant. The SSAR, in addition to appearing, will submit written proposed findings of fact and conclusions of law to the ALJ after the case has been heard.

Court exhibit 3 provides some background information as to why the project will be continued since it was only supposed to last one year after October, 12, 1982 and Court exhibit 4 is a more expanded procedural manual for the restructured offices.

## FINDINGS OF FACT

(1) One of the stated purposes when the project began in October 1982, was to improve timeliness of hearings, and "result in a more expeditious process." This court finds from the statistics which have been furnished from October 1982 through February 1986, from affidavits which have been submitted by attorneys, from evidence which has been presented by claimants, from personal interviews of ALJs, and from other documents presented by the government that the exact reverse has occurred and the time for hearing dispositions has greatly increased. In some instances, the time for hearing a case is three times as long; there is a longer delay between the request for a hearing and the hearing: the number of cases disposed of by the ALJs has decreased; more cases are being referred to the Appeals Council for own-motion reviews by the SSARs, many of which should not have been sent to the Appeals Council for own-motion review:

which cumulatively has resulted in great harm to claimants by causing delay in their receipt of benefits.

From an affidavit filed by Phillip T. Brown, Chief ALJ of the OHA, dated November 22, 1983, attaching certain statistics in accordance with a court order, the court finds the following: the number of claims closed by the Kingsport OHA from the period of January 1, 1982 through October 30, 1982 was 1,589; whereas, the total from January 1, 1983 through October 30, 1983 was 1,570. In addition to this, there were more than one hundred more claims filed in 1983 through October 30, 1983 was 1,570. In addition to this, there were more than one hundred more claims filed in 1983 than during the same period in 1982. Furthermore, the number of hearings conducted declined. For the ten-month period in 1982, it was 1,346 whereas, for the same period of time in 1983, it was 1,242. During the period in 1982, there were no referrals to the Appeals Council for their own-motion review and for this ten-month period in 1983, there were 62 referrals. In other words, every one of these statistics shows that in the period before the SSARP went into effect, compared with the same period after the SSARP went into effect, the timeliness of the hearings and the expeditiousness of the hearings had declined. There are 26 OHAs in Region IV and on April 30, 1982, of the percentage of cases held over 180 days, the Kingsport OHA ranked number eight out of a possible twenty-six. By May, 1982, in this same category, the percentage of cases over 180 days old rose at Kingsport from 7.6% to 11% and Kingsport dropped to fourteenth in Region IV. By May 31, 1983, Kingsport was 25th out of the 27 OHAs in Region IV and on June 30, 1983, Kingsport was 22nd out of 25 OHAs of Region IV. On April 30, 1982, Kingsport ranked 13th out of 24 OHAs in the average processing time and on May 31, 1983, Kingsport was ranked 22nd out of 24 divisions in average processing time. In April, 1982, Kingsport was 7th out the 28 OHAs in average disposition per ALJ with a monthly disposition rate of 43 cases per ALJ, whereas, by May 1983,

the Kingsport OHA was 17th with an average disposition rate of 41.2 cases per ALJ. If the statistics had dropped only in one category after the SSARP came into effect, it might be easily explained away, but under the circumstances, the statistics bear out what the witnesses have testified to in the case; i.e., that it takes much longer to conduct a hearing, much longer to get a decision, much longer to develop the case, and has resulted in delays in the case, rather than improving and making a more expeditious process. An affidavit of an attorney, J.D. Morefield, dated February 28, 1983, states that at that time, he had conducted eight hearings in which SSARs were involved; that no prehearing development had been done by them; that the procedure was strictly adversary; that no cases involved a recommendation of approval; that the hearings took over twice as long; that, as of the time of the affidavit, he had received no opinions from the ALJs; that he appeared at a hearing on February 7 in which the claimant was very ill and the SSAR strenuously defended the case and the claimant died on February 9, 1983 without a decision; that on February 16, 1983, he represented a claimant who had been in the Southwestern State Hospital, a mental hospital at Marion, Virginia, for three to three and one-half years; that the SSAR strenuously defended the claim and the claimant was returned to Southwestern State Hospital and remained hospitalized as of the date that the attorney made the affidavit. (Plaintiff's Exhibit F).

In Appendix B attached to the affidavit of Chief ALJ Phillip T. Brown, the record shows that for the year preceding the commencement of the representative program, in all of Region IV, there were 67,744 cases with an average reversal rate of 56.1% and for the period from October 1982 through September 1983, the reversal rate had risen in the entire Region IV on a total of 75,233 cases to 57.72%. The court does not have the exact figures from the Kingsport OHA for this period of time, although an effort has been made to obtain the same; however, the court does have in Court Exhibit

5, the total figures from October, 1980 through February 1986 showing 5,729 total cases received and decision favorable to the claimant of 54.9%, however, this figure also shows an 8.5% dismissal rate and since dismissal are not considered in the cases in which a decision has to be made, because ordinarily, this would be upon recommendation of the SSAR, this again shows the drastic reduction in favorable decision from the Kingsport OHA, as compared to the Region as a whole.

This court notes that the proposed new procedure, whereby the file would be sent to an SSAR instead of to the OHA, would cause additional delay because the claimant would be entitled to a *de novo* hearing at this stage of the proceeding and it should be assigned to an ALJ immediately so that he can pursue the claim. The April 28, 1983 report of Joy Loving, Director of SSARP, showed that cases awaiting decision in the Kingsport OHA was 212; that the regional average was 167; that in the Kingsport OHA, the number of untyped decisions was 127 and the regional average was 71. Miss Loving goes on to say in this report, which is one of the exhibits presented by the government in response to discovery, that she could not find any evidence that the backlogs are a result of the SSARP.

(2) One of the goals of this program was that it was to create some uniformity of decisions. The results have shown that there is not uniformity even among the various offices participating in SSARP. In the May 1983 report directed to Louie B. Hayes, Associate Commissioner for OHA from Joy Loving, the record shows that the percentage of reversals of dispositions in the Baltimore office was 43%; Brentwood, 63%; Columbia, 36%; Kingsport, 49%; and Pasadena, 53%. Loving went on to state in this report, "I estimate that almost onefourth of the reversal decisions issued are the result of GR recommendations." There was also a great deal of difference between decisions involving unrepresented claimants and those involving represented claimants. For example, the record from October 1982 through February 1986 discloses as between represented and unrepresented claimants in the Kingsport OHA that the unrepresented claimants totaled 1,286 of which there were 412 decisions favorable to the claimants and 454 unfavorable to them and 107 dismissals, showing that nearly 60% of the claimants without counsel lost their claims. On the other hand, according to the report of Loving in May of 1983, in four of the five participating SSARP OHAs, it appears that where an SSAR was involved and there was an adversary status, there was a higher reversal rate. Remarkably, in Pasadena, California, the represented claimants were only awarded benefits 48% of the time whereas, the unrepresented claimants were granted benefits 49% of the time. Thus, in Pasadena, the people who did not have counsel won more cases than those who did have counsel whereas, in the other participating OHAs, the opposite was true, and by a large percentage. One searches in vain among the statistics which have been furnished to find anything to show that there has been uniformity in arriving at decisions nationwide even among those OHAs participating in the SSARP much less compared to those who do not participate.

(3) Has the quality of the hearing dispositions improved? The answer to this has to be a resounding no. It was pointed out in the regulations that the duty would be placed upon the SSARs to take away from the ALJs the burden of developing the cases so that the ALJs could devote their time toward making decisions and getting out opinions. The statistics which the court has been furnished up to this time show that there has been a remarkable decline in decisions, particularly in the Kingsport OHA, as compared to the period of time before October, 1982. Admittedly, these statistics are incomplete, but the court can only deal with the statistics that have been furnished. Furthermore, the attorneys who have filed affidavits in this case have remarked on the slowness of getting decisions. This court is in a good position, due to the number of appeals which come to it, to evaluate the decisions

which have come out of the Kingsport OHA compared with those before the SSARP was commenced. This court has not kept statistics on the number of remands for improperly developed files, however, the court is concerned about the lack of proper development on the part of the SSARs. According to affidavits made by the attorneys in this case, the SSARs had done very little in developing the files. If the SSARs found that the claimant's case was weak, they left it alone; but if the claimant's case was strong, consultative examinations were sought. This court has issued one published opinion dealing with this problem, *Darnell v. Bowen,* 631 F.Supp. 96 (W.D.Va.1986). In the *Darnell* case, the court stated as follows:

There is no contradictory evidence in the case *sub judice,* because the SSAR and the ALJ totally failed in their duty to fully and fairly develop the evidence by obtaining consultative physical and psychiatric examinations for the indigent SSI claimant, and in so doing, they defeated the intent of Congress in establishing the SSI program.

The court went on to state:

In short, the SSAR, instead of developing the evidence for hearing, in Darnell's claim, totally failed in his duty so to do to the benefit of his client, the Secretary, and to the detriment of the indigent SSI claimant. Such disregard for the purpose of the SSI program and the purported intent of the SSARP borders on outrage. The SSAR magnanimously offered to consider additional evidence in this matter: 'by copy of this motion, statement and a copy of the list of proposed exhibits presently of record, we are advising the claimant's appointed representative of our current position in this matter.... We are not aware of the existence of any addition relevant evidence.'

*Id.*

Thus, in *Darnell,* the burden of developing the case was shifted to the indigent SSI claimant from the SSAR. This court went on to say:

This case is illustrative of one of the many problems that this court has perceived since the inception of the SSARP. Under the notice of proposed rule-making and the final rule-making by the Secretary and the adoption of the SSARP regulations, it was represented that the SSARs would be non-adversary. It has become manifestly apparent to this court that the SSARs in practice have been almost totally adversative, and that their prehearing development of claims has been a one-sided development in favor of the Secretary in disregard of their duty to fairly and fully develop the claim not only for the Secretary but also for the claimant. This case just represents one bad example, among dozens of others that the court has observed since the inception of the program in October of 1982 at the Kingsport, Tennessee Office of Hearings and Appeals.

*Id.*

This court notes that when this program began and the court sent Magistrate Wolfe to attend the hearing in regard to the program, the court was of the opinion that the program might be needed to help develop the cases, because many cases came before the court poorly developed. The court must note, however, that there has been no improvement in the development of cases; indeed, the opposite effect has occurred. Therefore, this court has inquired of ALJs located at the Knoxville, Tennessee; Middlesboro, Kentucky; and Roanoke, Virginia OHAs to determine if those ALJs have sufficient support staff to properly develop the record without the assistance of any SSARs. The reply from all ALJs has been that they have more staff than they need and that every effort has been made to furnish them with sufficient support staff to properly develop the record without the assistance of any SSARs. The reply from all ALJs has been that they have more staff than they need and that every effort has been made to furnish them with sufficient staff to properly develop their cases, to assist in writing their opinions, and as

far as any need for the SSARP to help develop the cases, there is absolutely none.

(4) In the regulations promulgated on August 19, 1982, it was stated as follows:

After the hearing, the SSA representative will not participate in any proceedings before the Appeals Council, although the Appeals Council may exercise its authority to review any case on its own motion.

The regulations went on to say, however, that an SSAR could call the attention of the Appeals Council to the fact that a certain case might merit own-motion review. Court Exhibit No. 6 is a letter from an ALJ in the Kingsport OHA expressing his views on the restructuring of the SSARP. This letter is dated December 4, 1985 and in it, the ALJ observes as follows:

I am particularly concerned with the practice of the SSAR referring almost any favorable decision to the Appeals Council. Claimants falling under the SSAR Project are clearly subjected to a more rigorous review.

Exhibit No. 7 is an internal document of the Kingsport OHA, dated May 14, 1985, on the subject of referrals to the Appeals Council for own-motion review by SSARs. Exhibit No. 7, reports on cases of various ALJs referred by SSARs for Appeals Council review, in which the facts reveal that a great injustice was done to the claimants.

One such claimant was an unskilled person disabled by coronary artery disease, with an implanted permanent pacemaker, 50% occlusion of the left anterior artery, documented, and a positive maximal stress test, borderline I.Q. and a diagnosis of chronic, severe schizophrenia, paranoid type. The grids alone resulted in a conclusion of disabled under Rule 201.06. Because an SSAR asked for review by the Appeals Council, the case was remanded. Another hearing was held in which two medical advisors and a vocational expert were called in to testify. A year had elapsed between the time of the first ALJ hearing and the second ALJ hearing and the evidence was overwhelming from these independent experts that based on the

same evidence which was before the first ALJ a year earlier, the first decision was correct.

In another case, the claimant was found disabled due to severe cardiovascular and musculoskeletal impairments. An ALJ issued a favorable decision on June 22, 1983. Upon recommendation of the SSAR, the Appeals Council remanded the case finding that it was not supported by substantial evidence. On January 26, 1984, before another hearing could be held in this case, the claimant died of acute heart failure. On March 5, 1984, the SSAR submitted a motion recommending a favorable decision stating that the claimant had died following an interval since onset. The absolute injustice of this act almost defies description.

On July 27, 1983, in another case in the Kingsport OHA, a claimant, 45 years of age with severe impairments of chronic arthritis, diabetes, hyperthyroidism, arteriosclerotic heart disease, angina, sarcoidosis, the Appeals Council granted own-motion review based on SSAR referral. A supplemental hearing was held and a medical advisor and vocational expert testified at additional expense to the government and, on April 13, 1984, an ALJ reached the same decision that had been reached a year earlier.

On March 21, 1984, in another case in the Kingsport OHA, a favorable decision was rendered by an ALJ that was referred to the Appeals Council. The Appeals Council reversed. A supplemental hearing was held by another ALJ and over a year later, on April 1, 1985, the second ALJ found disability.

On April 11, 1984, in another Kingsport case, an ALJ issued a favorable decision to a person with chronic congestive heart failure. The SSAR suggested Appeals Council review and the case was reversed by the Appeals Council. Another ALJ held a hearing on February 6, 1985 and issued an opinion with the same results as had been reached by the previous ALJ in April of 1984.

In another case from this area, an ALJ made a decision on May 4, 1984 favorable to the claimant in an SSI case finding that the claimant met 12.05(C) of the listing of impairments. The claimant had a full scale I.Q. of 63 with significant respiratory and congestive impairments. The SSAR referred this case to the Appeals Council and it was reversed. Another ALJ arrived at the same conclusion as the previous ALJ. The date of this later decision was not given but apparently it was sometime in 1985.

On September 21, 1984, an ALJ in another case, found that a claimant was disabled because of a severe musculoskeletal impairment and an emotional impairment equivalent to a Section 1.05(C) of the listing of impairments. Claimant had been treated for an episode of major depression in 1981. An SSAR referred this case to the Appeals Council and on November 19, 1984, this case was reversed by the Appeals Council. A supplemental hearing was conducted at which two medical advisors, an orthopedic surgeon and a board-certified psychiatrist appeared to testify and stated their opinions that the person did meet the listing of impairments and that such level of severity dated back to October 1978. On March 29, 1985, for the second time an SSAR referred this case for own-motion review to the Appeals Council and made an argument that the claimant did not experience an impairment on the date that his earnings expired on June 30, 1982. No record was given of the final disposition of this case.

On January 8, 1985, an ALJ found in favor of a claimant 52 years of age with a limited education and prior experience as a welder. This was referred to the Appeals Council by an SSAR and the Appeals Council remanded the case on March 11, 1985. The attorney for the claimant, S. Strother Smith, III, filed a motion with this court requesting that the claimant not be required to attend a consultative examination because he felt it would be detrimental to his health. This court made an effort to ascertain if the ALJ would give an expedited hearing in this case. The Chief Administrative Law Judge contacted the Kingsport office and reported that the Office of General Counsel was getting "extreme pressure" on this case and that they would like to see the hearing process expedited. The outcome was that no supplemental hearing was held. A fully favorable decision was finally issued.

Throughout this entire proceeding, each time that oral argument was held before this court, counsel for the government has, with absolute sincerity, told the court that SSARP is not an adversary proceeding. Furthermore, they aver that the SSARs, when they recommend that a case be reviewed by the Appeals Council, do not file a brief and do not act as counsel. This court is of the opinion that counsel did not intentionally misrepresent the program. This court has found that government attorneys only represent to the court what is represented to them. This court has found that while it was being represented to the court that such action was not being taken, absolute, positive evidence has been presented to the court that it was. It is not uncommon in large corporations and in the vast government bureaucracies that the left hand does not know what the right hand is doing, but it is shocking that so little is known of an experimental program of such significance.

The case of *Marceleen F. Scott* which is thoroughly documented in this file reveals that Ronald Mullins, an SSAR in the Kingsport OHA, on May 9, 1985, "referred" this case to the Appeals Council for review. In an argument in the form of a two-page brief,[11] the SSAR, in conclusion, stated that the ALJ had committed an abuse of discre-

---

11.  Department of Health & Human Services
Office of SSA Representatives
Social Security Administration

Refer to:                              MEMORANDUM

Date:      May 9, 1985

From:   Ronald Mullins, SSA Representative
Thru:  Robert J. Smith, SSARP Manager, Kingsport

Subject:  SSAR Referral in the case of
MARCELEEN F. SCOTT, SSN 229–38–4367
W/E 418–10–3728

tion in an area of law in his decision. Marceleen Scott then asked to be allowed to intervene in this suit. Mrs. Scott's favorable decision by an ALJ was rendered on May 7, 1985 and she intervened in this case on July 31, 1985. On September 17, 1985, Marceleen F. Scott again received a favorable decision and on October 17, 1985, without any Appeals Council action whatsoever, the government made a motion to dismiss her complaint in the case because it was moot in that she had received her widow's insurance benefits under Title II and SSI under Title XVI of the Act.

Statistics set forth in Court Exhibit No. 5 show that from the time the program be-

gan through February 1986, there were 162 referrals by SSARs to the Appeals Council which represented 9% of the total dispositions of the Kingsport OHA during this period of time. Of these cases, as of January, 1985, the Kingsport OHA reported that there had been 130 referrals and out of this number, only 21 cases were remanded, and 16 in which the ALJ's decision had been reversed. This again shows the extra time consumed by the SSARs and the delays which their tactics have caused without justification, resulting in undue expenditures and great hardship to claimants.

(6) This case has been represented as one in which there is an experimental

To: Director, Office of Appeals Operations, OHA
Attn: Bellmon Review Branch (B)
P. O. Box 3200, Arlington, VA 22203

Under the provisions of sections 404.965(f) and 416.1465(f) of Social Security Administration Regulations Nos. 4 and 16 (20 CFR 404.965 and 416.1465), this case is referred to the Appeals Council for possible review on its own motion under sections 404.969 and 416.1469 of Regulations No. 4.

In his decision of May 7, 1985, the administrative law judge (ALJ) found the claimant experiences impairments so severe they are equivalent in severity to the respective requirements contained within provisions 1.02(A) and (B), 10.10(A) and (B) as well as 12.04(A)(2) and (B) of Appendix 1 of Subpart P of Regulations No. 4. Consequently, the ALJ further found the claimant both eligible for supplemental security income (SSI) and entitled to widow's insurance benefits (DIWW).

The state agency's initial and reconsideration SSI determinations concluded the claimant maintains a residual functional capacity for medium work. The claimant was, therefore, regarded as not disabled by the application of medical-vocational guideline 203.18. The state agency's initial DIWW determination indicated the claimant's impairments were not severe, whereas the reconsideration determination concluded the claimant's impairments were not severe enough to meet the criteria necessary for entitlement.

Social Security Ruling 83–19 (SSR 83–18, C.B. 1983 p. 104) sets forth the following adjudicatory standard within the context of the "policy statement" contained therein:

> Under the concept of medical equivalence, a physician designated by the Secretary is required to decide whether the medical findings

of an individual's impairment(s), although not specifically described by any listed set of medical criteria in the listing, are at least medically equal to one of the listed sets.

This ruling also specifies that new evidence, not previously reviewed by a Social Security Administration designated physician, requires the ALJ to "obtain an updated medical judgment from a medical advisor." (Ibid, p. 107) The intent of this latter requirement is apparent when it is observed that SSR 83–19 asserts: "Decisions of equivalence are the responsibility of a physician designated by the Secretary." (Ibid, p. 106)

While the ALJ did obtain new medical evidence in the form of post hearing consultative examination reports, which reports he relied on when finding equivalency of the claimant's impairments with various provisions of Appendix 1, the ALJ failed to follow the requirement of SSR 83–19 regarding the necessity of seeking an updated designated physician's opinion on the question of equivalency. This action by the ALJ represents both an abuse of his discretion and an error of law that were material factors leading to the ultimate respective decisions.

Consequently, this case is respectfully referred for your possible review.

Ronald Mullins
SSA Representative

RM:bf

Enclosure (Case folder)

cc: Diane F. Dusseau, Attorney (2)
Peter P. Behuniak, ALJ
Director, SSARP

EXHIBIT P

project going on in which there is no adversary proceeding involved; that it is simply a situation in which the SSAR is there to assist the ALJ. The latest action which removes the SSAR offices from the OHAs and establishes them at a different location where they can handle the cases as they see fit without supervision by ALJs shows that this program has moved at a rapid pace to become a full-fledged adversary proceeding.[12] Let us compare a normal lawsuit which is filed in a clerk's office, an independent office. In this experimental Social Security program, the suit is brought and the file remains in the hands of one attorney (an adversary) and the other one does not have possession of the file until such time as the ALJ gets to hear it and the ALJ does not have the file until such time as he gets ready to hear the case. The ALJ is required to develop the case but is prevented from doing so because it is in the hands of an SSAR who is representing one side of the case. The SSAR is free to develop the file in any manner he sees fit. We are all aware of the unfortunate situation in which a person can be sent to enough doctors until one will find or make some different diagnosis from the others or will fail to diagnose any impairment. All that is needed is one doctor to say something contradictory and there is a factual issue which has to be resolved. The federal courts are bound by the Secretary's finding of facts even if one person says one thing and ten say another. The situation exemplified here shows jurisprudence at its worst. An ALJ can only conduct an informal hearing; he is not set up to conduct a court trial. He has no power of contempt. He has no way of maintaining order. How is he expected to carry out his function as a judge charged with developing the evidence when the file is in the possession of a person representing the government? When an attorney for the government appears before this court and says that this case does not represent a situation in which an adversary type proceeding has developed, he is refusing to admit what the facts reveal.

(7) This court finds that both the SSARP and the AIP are simply nothing more nor less than an attempt by the bureaucracy to control the independence of the ALJs. Their mission is to employ people who will have control of the files before they go to the ALJ. This program began in an announced purpose of having the representatives develop the case and permit the judge to sit and objectively hear and, if necessary, further develop and decide the case. By giving the file to the SSAR instead of to the ALJ it permits the government a second chance to defeat the claim by new medical evidence without the claimant knowing anything about it. It affords the opportunity for the SSARs to go fishing for additional evidence to support the government's position. In essence, there are persons in the administration who do not trust judges and in particular, do not trust ALJs and who want to destroy their independence, and have used the SSARP and AIP process to aid in their efforts.

(8) The Social Security Administration, by unadvertised internal decision, radically changed the SSARP to the AIP by internal rules that do not have the force and effect of regulations duly adopted after advertise-

12. As additional evidence that the SSARP and AIP has been permitted to be used as a full-fledged adversarial proceeding, Court exhibit 9 is a report from the Columbia, South Carolina SSARP office on the use of SSARs to present oral argument in 25 Social Security appeal cases before United States Magistrate Robert S. Carr of the United States District Court for the District of South Carolina. On August 6–8, 1985, SSARs presented oral argument before Magistrate Carr in 25 cases. The report further indicates that the SSARs plan to participate in oral argument before Magistrate Carr in 111 additional cases in a five-week period. Court exhibit 9 reflects that the arguments made by the SSARs were adversarial in nature. The court appearances by the SSARs is completely outside the scope of the Secretary's regulations for the SSARP and are in violation of the provision that SSARs will not participate in claims beyond the ALJ hearing stage. This action on the part of those implementing the SSARP is indicative of their intention to make Social Security hearings a completely adversarial process. If this is done, it should be done by Congressional amendment to the Social Security Act.

ment in the Federal Register, as required by the APA.

## I.

### PROCEDURAL DUE PROCESS

What is and what is not procedural due process is as varied as the various administrative proceedings in the governments of states and of the United States and what is procedural due process under one set of circumstances where governmental action is involved may not apply in an entirely different governmental action depending somewhat upon the private interests involved. In *Hanna v. Larche*, 363 U.S. 420, 442, 80 S.Ct. 1502, 1514, 4 L.Ed.2d 1307 (1960), the Supreme Court stated,

[D]ue process embodies the differing rules of fair play which, through the years, have become associated with differing types of proceedings.

The particular nature of procedural due process as it applies in a Social Security context, is clearly set forth in a landmark case, *Richardson v. Perales*, 402 U.S. 389, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971), where the Court stated the following:

There emerges an emphasis upon the informal rather than the formal. This, we think, is as it should be, for this administrative procedure and these hearings, should be understandable to the layman claimant, should not necessarily be stiff and comfortable only for the trained attorney, and should be liberal and not strict in tone and operation. This is the obvious intent of Congress so long as the procedures are fundamentally fair.

*Id.* at 400–401, 91 S.Ct. at 1427.

Citing *Flemming v. Nestor*, 363 U.S. 603, 80 S.Ct. 1367, 4 L.Ed.2d 1435 (1960) and *Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, the *Perales* Court stated that the right to Social Security benefits is in one sense earned and that the "extent to which procedural due process must be afforded to the recipient is influenced by the extent to which he may be condemned to suffer grievous loss." *Perales*, 402 U.S. at

401–402, 91 S.Ct. at 1427. Thus, the Court noted that there was a private interest involved which was affected by the governmental action and therefore the focus must be upon the private interest. *Id.* at 401–02, 91 S.Ct. at 1427–28. Thus, procedural due process in Social Security cases requires a much stricter standard than, for example, a Veterans Administration claim where there is no protected property interest but, rather, a recipient of government benefits receives them, in a sense, by way of grace. *Gendron v. Saxbe*, 389 F.Supp. 1303 (C.D. Cal.1975); *aff'd*, 423 U.S. 802, 96 S.Ct. 9, 46 L.Ed.2d 23 (1975).

Again, stressing that due process is a flexible concept, the Supreme Court has further described the type of due process required in a Social Security case in *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), where the Court said at 334–35, 96 S.Ct. at 903:

More precisely, our prior decisions indicate that identification of the specific dictates of due process generally requires consideration of three distinct factors: first, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interests through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the government's interests, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

■ The court is of the opinion that the SSARP does not meet the three-prong standard for procedural due process of *Eldridge*, nor does it meet the informal and fundamentally fair test of *Perales*.

With regard to the first prong of the *Eldridge* test relating to the private interest, it is obvious that, in a Social Security context, a person has a property interest to protect. The undisputed evidence in this case shows that instead of meeting a standard of speeding up and facilitating the processing of claims, this procedure has tended to lengthen and cause delays in a

person's obtaining disability benefits. The goal to build upon the record and to present a better record for review has had the opposite effect and has resulted in SSARs obtaining evidence for the government without regard to developing the cases for the claimants. The statistics show that in the five OHAs originally involved in the experiment prior to the adversarial proceeding beginning, about five out of ten claimants had strong enough cases to justify the granting of benefits, however, since the SSARs entered the picture, they have recommended that only one out of ten claimants has a strong enough case. Thus, the SSARs are opposing ninety percent of all the claimants with strong enough cases to win.

In every circuit in the United States that has examined the question, the courts have held that the evidence of the claimant's treating physician is preferred over other medical evidence and is entitled to greater weight because it is based upon a continuing observation of the claimant over a period of time. E.g., *Mitchell v. Schweiker,* 699 F.2d 185 (4th Cir.1983). In this experimental program, the SSAR has failed to request evidence from the claimant's treating physician ninety percent of the time. Obviously, there is a delay between the time that the state DDS has collected the evidence in the case and it reaches the hearing level, therefore, an updated treating physician's report should be one of the first things obtained in most cases.

The SSARs, using their authority to refer cases to the Appeals Council have adopted an adversary appellate process as shown by the undisputed evidence in this case. They, therefore, refer decisions favorable to the claimant 20% of the time according to the statistics which have been presented. From January, 1983 through August, 1983, a total of 289 decisions favorable to the claimants were issued at the Kingsport OHA and during this period of time, the SSAR referred 56 cases, or a total of 19.38% of the favorable decisions. The court, in its factual findings discussion, has set out some examples of the procedure's adverse effect on claimants. One had died during the appellate process and in all of the others there was approximately an additional year before they received their Social Security benefits. Without the SSARs, it is probable that none of these cases would have been before the Appeals Council for its own-motion review.

Furthermore, as this court has pointed out in the findings of fact, the goal of the program to assist the ALJ in the development of the evidence has not been achieved. The only change in the development of the case has been to prevent the claimants from recovering and not to assist the claimant in any way. The government has not presented evidence to this court in a single case in which evidence has been produced favorable to the claimant that enabled the claimant to obtain Social Security benefits. Under the previous system, the ALJ was an independent person with judicial experience, hired by an independent agency, and he was in control of the development of the evidence. There was better development of the record than has been shown under the current procedures.

The second prong of the *Eldridge* test is whether there is a risk of an erroneous deprivation through the procedures used. An actual examination of cases showing the effect of the SSARs on the appeals process reveals that there is a risk of an erroneous deprivation as shown by those cases which have been referred to the Appeals Council by the SSARs and have resulted in the claimant eventually receiving benefits after lengthy delay. Also, the wide discrepancy in the statistics relating to claimants not represented by counsel indicates an erroneous deprivation to a large group of people through the procedures used.

With regard to the third prong of the *Eldridge* test, as to whether the government's interest would be improved either by relieving the government of administrative burdens or fiscal responsibilities, there has been no showing that the government's interest is protected in this regard. Despite the fact that numerous congressmen

have requested figures on the cost of this program, there have been none presented in response to their requests and there have been none presented to this court; however, it is obvious that when an entirely new bureaucratic entity has been established, there is an extra fiscal burden upon the government. The ultimate results do not show that there is any reduction in the grant of benefits. If there is any benefit to the government, it relates only to delayed payment of benefits by the government to the detriment of claimants; however, no evidence was presented concerning this.

The greatest lack of fundamental fairness as required in the *Perales* test is that the proceedings which have heretofore been deemed to have been informal and non-adversarial are now formal, stiff, strict and adversarial. There are no rules of evidence to guide ALJs in conducting adversary proceedings. They have no power to hold one in contempt, a necessity in a formal adversary proceeding. Congress did not intend it to be an adversary proceeding, and, indeed, the regulations which were promulgated at the time the SSARP was announced do not require an adversarial proceeding. The element of fundamental unfairness is obvious in this regard. Furthermore, an essential element of fundamental fairness is notice of a hearing within a reasonable time. The statistics show that the SSARP causes delays in processing and is violative of due process in this regard.

Another requirement of due process is that administrative agencies must follow their own rules. As was stated by the Court of Appeals for the Ninth Circuit:

> When administrative bodies promulgate rules or regulations to serve as guidelines, these guidelines should be followed. Failure to follow such guidelines tends to cause unjust discrimination and deny adequate notice contrary to fundamental concepts of fair play and due process. (Citations omitted).

*N.L.R.B. v. Welcome-American Fertilizer Co.*, 443 F.2d 19, 20 (9th Cir.1971); see also, *Electronic Components Corp. of N.C. v. N.L.R.B.*, 546 F.2d 1088, 1090 (4th Cir.1976). In *Perales*, the features which were approved as fundamentally fair included the admissibility of written reports of licensed physicians which was predicated upon five factors: (1) the doctors, although paid a consulting fee by the state agency, were independent, unbiased and disinterested; (2) the hearing was non-adversarial; (3) the reports reflected an endeavor to ascertain the truth; (4) the reports rested upon accepted medical procedures and tests; and (5) the doctor could be subpoenaed for cross-examination. Three of the five factors present in *Richardson v. Perales* are absent in the SSARP. The government advocates are not independent. They are hired by the agency which is a party and they are not unbiased and disinterested and no one even argues that they are. The mere presence of a government advocate at the hearing renders it adversarial and indeed, he proceeds so to act on through the appellate process. Finally, unlike the consultative physician in *Perales*, the government advocate is under no obligation to try to ascertain the truth, but, rather, he is there to state the SSA's position in the case. As this court noted in the opening remarks in connection with this case, the whole purpose of any proceeding should be to seek out the truth. This objective has been lost in this administrative process, and due to the fundamental unfairness inherent in the SSARP and the AIP, they violate due process.

## II.

THE SSAR PROGRAM HAS VIOLATED ITS IMPLEMENTING REGULATIONS AND WAS NOT PROPERLY IMPLEMENTED FROM THE BEGINNING

It is a fundamental principle of administrative law that an agency must comply with its own regulations. Once regulations have been duly promulgated, they are as binding upon the government as they are upon the citizen. *Service v. Dulles*, 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403

(1957). Thus, an agency is bound by its own regulations and commits procedural error if it fails to abide by the same. *Electronic Components Corp. of N.C. v. N.L.R.B.*, 546 F.2d 1088 (4th Cir.1976). In particular, the requirement that an agency is bound to follow its own rules has been applied specifically to the Secretary of HHS in Social Security cases. *Hall v. Schweiker*, 660 F.2d 116 (5th Cir.1981). The regulations promulgated in this case are the SSARP, 20 C.F.R. §§ 404.965 and 416.1465 published at 47 Fed.Reg. 36,117 *et seq.* (Aug. 19, 1982). In addressing the question as to whether the program would be adversarial these regulations stated:

> It was never our intention that the SSA representative would categorically advocate affirmation of state agency decision denying benefits. On the contrary, as representatives of the SSA, these individuals will not advocate the denial of claims when the evidence presents a clear case for entitlement. To emphasize this, we have clarified the language of the regulations.... To provide that the SSA representative may, when appropriate, request that the administrative law judge allow the payment of benefits. We believe that this change will resolve any uncertainty about whether the role of the SSA representative is adversarial.

■ As this court has pointed out, all of the evidence in this case shows that the SSARP is an adversarial process. Without repeating the evidence that has been previously set forth, the court would particularly note the adversarial nature of the proceedings as they have recently been outlined wherein the SSARs will be located in a separate office and will have complete control of the file. They will determine when the case will be assigned to an ALJ for a hearing and will be comparable to any other attorney except that he is an advocate on one side of the case who has complete control of the case file until the time of trial.

Additionally, when the SSARP was changed by internal memoranda and rules promulgated by the Secretary to the AIP effective April 1, 1986, it should have been advertised in the Federal Register pursuant to the rule-making procedures in the APA. 5 U.S.C. § 553. In disregard of the opinion of Joy Loving, Acting Director of the SSARP (*see* page 1049, *supra*), and the well-reasoned opinion expressed by Chief ALJ Barry M. Wesker of the Pasadena, California OHA (*see* court exhibit # 8), that in order to change the project, in Loving's observation by expanding or enlarging the SSARP and in Judge Wesker's observations concerning the proposed change from the SSARP to the AIP, Federal Register publication would be necessary, the Secretary proceeded to implement the changes by internal memoranda and rules revisions that were not published in the Federal Register pursuant to the APA.

## THE SSAR VIOLATES THE SOCIAL SECURITY ACT

■ The legislative history of the disability program, which was added by the Social Security amendments of 1956, 70 Stat. 818, shows that the Social Security Administration was designed to function as an impartial adjudicator of the claims and not as an advocate. In *Richardson v. Perales, supra,* the Supreme Court, in reviewing the legislative history of the Act, noted as follows:

> We bear in mind that the agency operates essentially, and is intended so to do, as an adjudicator and not as an advocate or adversary. This is the congressional plan. We do not presume on this record to say that it works unfairly.

402 U.S. at 403, 91 S.Ct. at 1428. In 1979, citing *Perales* and *Eldridge,* the Supreme Court stated as follows:

> Again, the Court has been sensitive to the special difficulties presented by the mass administration of the Social Security system. After the legislative task of classification is completed, the administrative goal is accuracy and promptness in the actual allocation of benefits pursuant to those classifications. The magnitude of that task is not amenable to the full trappings of the adversary process

lest again benefit levels be threatened by the cost of administration. Fairness can best be assured by Congress and the Social Security Administration, through sound managerial techniques and quality control designed to achieve an acceptable rate of error. (Citations Omitted).

*Califano v. Boles,* 443 U.S. 282, 285, 99 S.Ct. 2767, 2770, 61 L.Ed.2d 541 (1979).

There can be no better expression of the intention of Congress on the issue of Social Security ALJ hearings being non-adversarial than that by Judge Winter in *Adams v. Harris,* 643 F.2d 995, 1003, n. 8 (4th Cir. 1981) (Winter, C.J. dissenting):

I agree with the Secretary's contention that the disability determination process was designed by Congress to be non-adversarial. I would emphasize that the Social Security Administration misconceives its role when it casts itself as adversary to the claimant by erecting unnecessary barriers to the truthfinding process.

This court has recognized that if regulations are adopted by the administration which are in contradiction to the statute, they are "simply void" because the Secretary has no power to promulgate regulations contrary to the Act itself. *Clements v. Celebrezze,* 216 F.Supp. 78 (W.D.Va. 1963).

The language of 42 U.S.C. § 405(a) permits the Secretary to adopt regulations which are necessary or appropriate, however, these regulations must be in accord with the Congressional intent that the disability hearings be non-adversative. In establishing the SSI disability program, Public Law 92–603, 42 U.S.C. § 1381 *et seq.,* it was stated that the program would have a uniform national scope. Furthermore, the Social Security amendments of 1956 clearly indicate the intention of having a uniform national program. It was not intended that Social Security and SSI disability programs would vary in different parts of the country. In this case, we have five areas of the country in which claimants are treated differently.

The SSARP violates the intention of Congress that the Social Security Act shall be liberally construed. The liberal and broad construction which must be afforded to the Act was succinctly stated by the Fourth Circuit Court of Appeals in *Cunningham v. Harris,* 658 F.2d 239 (4th Cir.1981). The court stated:

While an agency's interpretation and application of its own regulations are entitled to great weight, *see* 4 Davis, *Administrative Law,* § 30.12, we are also bound to interpret the Social Security Act as a program of social insurance on which people can rely to provide for themselves and their dependents. Claimants are the beneficiaries of insured wage earners, not recipients of government gratuities and are entitled to a broad construction of the Act.... Viewed in this light, we cannot accept the Secretary's restrictive interpretation. (Citations omitted).

*Id.* at 242–43. If there is any doubt as to the ALJs' views regarding the adversative nature of the proceedings involved, one need only to review the remarks of the Honorable Barry M. Wesker, Hearing Officer and Chief ALJ of OHA, Pasadena, California, which is one of the OHAs under the plan. In his remarks dated November 27, 1985, addressed to Frank V. Smith, III, Associate Commissioner, OHA, Court exhibit # 8, he states, in part, as follows:

I frankly cannot see that any portion of this restructuring dealing with delivery and caseload can be accomplished without the publication of new regulations. 20 C.F.R. § 404.900 and its companion in Title XVI state clearly that the first four stages of administrative review shall be informal and non-adversary. While it is true that 404.965 and 404.1465 [sic] have a 'notwithstanding' clause, the fact that the regulations provide that the claimant shall continue to have all the rights set out in this section make clear that these regulations do not intend for these proceedings to be adversarial. If the SSARP were to receive the potential evidence first, it seems axiomatic that this procedure goes beyond traditional adver-

sary proceedings in that the claimant has no discovery rights to assert and is entirely at the mercy of the SSARP.

In another part of this same memorandum under a heading "Adjudication under the Act," Chief Judge Wesker goes on to state as follows:

While § 205 of the Act provides the general authority for the Secretary to carry out the SSARP, the language of Part B–1 makes it clear that the Secretary must give the individual 'reasonable notice and opportunity for a hearing' and in pertinent part 'to hold such hearings and conduct such investigations and other proceedings as he may deem necessary or proper for the administration of this title. In the course of any hearing, investigation, or other proceeding, he may administer oaths and affirmations, examine witnesses, and receive evidence. Evidence may be received at any hearing before the Secretary, even though inadmissible under Rules of Evidence applicable to court procedure.' The last sentence quoted makes it clear that the Act intends for this to be a non-adversary procedure. The previous phrases as worded made it clear that it is a hearing which has primacy and the investigation which is secondary. To the extent that the SSARP's development of the case is an investigation, that development is secondary to the primary duties of the Secretary to the claimant; that is, to hold a hearing. Since it is only the administrative law judge who can hold such a hearing, the result should be obvious.

Chief Judge Wesker goes on to say under a heading of Court Cases:

In all circuits, it is a fundamental tenet that an administrative law judge has the responsibility for development. This fundamental jurisprudential concept is inextricably interwoven with the burden of proof as enunciated heretofore, to-wit: the claimant must first make a prima facie case before the burden of going forward with the evidence shifts to the government.... Further it is clear by this attempt to remove that developmen-

tal burden from the administrative law judge that the administration is curtailing the administrative law judge's authority without curtailing his responsibility ... however, when the administrative law judge who has been given this responsibility in no uncertain terms, allows that responsibility and statutory duty to be diminished in this fashion, we are coming very close to violations of a number of Canon of Ethics. One that comes to mind immediately would be number 2 of the Canon of Judicial Ethics dealing with public interest. The last sentence of that Canon of Ethics is particularly instructive: 'He should avoid unconsciously falling into the attitude of mind that the litigants are made for the courts instead of the courts for the litigants.'

## CONCLUSION

We have seen that the administrative procedures used in making Social Security disability determinations are a cumbersome "Rube Goldberg" process at best, which have been further encumbered by a threat to the independence of the ALJs who are the only people in the entire system who are oriented toward the main goal which should be the seeking of truth and ultimate triumph of justice. This experimental administrative program has been improperly implemented from its inception in violation of the Secretary's published regulations, in that it was advertised to be non-adversarial but has been adversarial from the beginning; has not achieved its goal of aiding in the development of cases but has, at best, maintained the present system or, at worst, tended to cause the ALJs to rely upon the SSARs to the detriment of claimants; has not achieved its goal of improving quality of decisions or expediting cases; has not achieved its goal of increasing productivity; has not achieved its goal of uniformity; is in violation of the intention of the Social Security Act itself; the regulations have not been implemented as required, in that SSARs have continued to participate after the hearing level by filing briefs with the Appeals Council; the AIP, as it is being implemented effective April 1, 1986, is in

violation of the APA because the changes were not advertised by notice in the Federal Register as required; and the entire concept, as it has been implemented in both the SSARP and the AIP, is in violation of the fundamental principles of procedural due process as prescribed by the Fifth Amendment and as determined by the courts to be applicable in social security cases.

For the reasons stated herein, a permanent injunction shall be granted enjoining any further proceedings using the SSARP or the AIP in any of the remaining five participating OHAs throughout the United States. An appropriate order will be entered this day.